UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ADRIENNE WAGNER,

     Plaintiff-Appellant,

v.                                 Case No. 13-1347

BANK OF AMERICA CORPORATION, *et al.*,

     Defendant-Appellee

**OPENING BRIEF**

Appeal from an order granting summary judgment in a case by
Judge Brooke Jackson, U.S. District Court for the District of Colorado

Oral argument is requested.

                        Robert M. Liechty
                        CROSS LIECHTY LANE PC
                        7100 E. Belleview Ave., Suite G-11
                        Greenwood Village, Colorado 80111
                        Tel:  (303) 333-4122
                        COUNSEL FOR APPELLANT

## I.    CORPORATE DISCLOSURE STATEMENT

Not required by this party.


## II.    TABLE OF CONTENTS

Jurisdictional statement  …………………………………………………..…… 3
Issues presented for review  ………………………………………………….. 4
Statement of the case  …………………………………………….………… 4
Statement of the facts  …………………………………………….………... 5
Summary of argument  ……………………………………………..………… 27
Argument  ………………………………………………………………… 28
     1. Ms. Wagner's actions implicated public policy  ………………..… 29
     2. Landsafe knew that Ms. Wagner believed she
        was reporting illegal conduct  ……………………………..……… 32
     3. Causation Causation Could Only Be Resolved by a Jury ……… 35
Conclusion  …………………………………………………………….....… 45
Certificate of compliance with Rule 32(a)  …………………….……….. 46
Certificate of compliance with Rule 25.3  …………………….……..…… 46

## III.    TABLE OF AUTHORITIES

***Barlow v. C.R. England, Inc***., 703 F.3d 497 (10th Cir. 2012) .. 27-8, 43, 44
***Bertsch v. Overstock.com***, 684 F.3d 1023 (10th Cir. 2012)  ……... 32, 44
***Bodaghi v. Dept of Nat Resources***, 995 P.2d 288 (Colo. 2000) …. 41, 44
***Churchey v. Adolph Coors Co***., 759 P.2d 1336 (Colo. 1988)  ………... 42
***Continental Airlines, Inc. v. Keenan***, 731 P.2d 708 (Colo. 1987)  ….… 42
***Crawford Rehab Serv, Inc. v. Weissman***, 938 P.2d 540 (Colo. 1997) .. 31
***Haynes v. Poudre V. Health Care***, 2011 WL1225590 (D. Colo. 2011) .. 29
***Kearl v. Portage Environ., Inc***., 205 P.3d 496 (Colo. App. 2008)  ……. 29
***Flores v. Am. Pharm. Serv., Inc***., 994 P.2d 455 (Colo. App. 1999) . 29, 30
***Lawley v. Dept. of Higher Ed***., 36 P.3d 1239 (Colo. 2001)  ………….. 44
***Lockheed Martin Corp. v. Adm R. Bd***, 717 F.3d 1121 (10th Cir. 2013). 38
***Martin Marietta Corp. v. Lorenz***, 623 P.2d 100 (Colo. 1992)  ….…. 28, 29

*Olson v. State Bd for Comm Col*, 759 P.2d 829 (Colo. App. 1988) ..…  42
*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995)  ………………...  42
*Stoney v. Cingular Wireless LLC*, 2008 WL 4371942 (D. Colo. 2008).. 29
*Van Zanen v. Qwest Wireless LLC*, 522 F.3d 1127 (10th Cir. 2008)  …. 41
*Webster v. Konczak*, 976 P.2d 317 (Colo. App. 1998) ….…… 27, 31, 33, 44
29 U.S.C.§1639e(e)  ……………………………………………….……  12, 33

## IV.  STATEMENT OF RELATED CASES

There are no prior nor related cases.

## *2*  JURISDICTIONAL STATEMENT

The district court had jurisdiction over a federal question pursuant to

28 U.S.C. §1331 because plaintiff asserted a whistleblowing claim under

the Dodd-Frank Act.  In addition, although such jurisdiction was not alleged

in the complaint, there was also complete diversity between the parties with

a dispute of over $75,000.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because it is

an appeal from a final order granting summary judgment on all claims in

favor of defendant.  Final judgment was entered on July 22, 2013, and Ms.

Wagner filed her notice of appeal on August 15, 2013.

## *2*   ISSUES PRESENTED FOR REVIEW

1. Whether the trial court erred in holding that Ms. Wagner had not presented sufficient evidence to support causation that she was wrongfully discharged in violation of Colorado's public policy?

2. Whether the trial court erred in holding that Ms. Wagner had to prove that an actual violation of public policy occurred or whether she had a reasonable belief that the violation has occurred?

## *2*   STATEMENT OF THE CASE

Ms. Wagner worked for Landsafe as a home appraiser from April, 2008, through May, 2011.  She claims that she was fired for complaining to management that co-appraisers were violating federal regulations.  She initially filed four claims for relief.  However, she agreed to dismiss two of them and, therefore, only her whistleblowing claims under the Dodd-Frank Act and under Colorado's public policy were still viable at the summary judgment stage.  **See** Pretrial Order, Apdx. 3.[1]

Discovery ended late and defendant filed its summary judgment motion on May 31, 2013 (Apdx. 367, doc. #48), with the briefing concluding on July 15, 2013 (Apdx. 368, doc. #60).  Trial had been sent to commence

---

[1] The appendix is Bates numbered Wagner 00001-369; thus, Apdx. 3 is page Wagner 00003.

July 22, 2013 (Apdx. 366, doc. #31), but Judge Jackson granted summary

judgment on July 19, 2013 (doc. # 66).

Ms. Wagner does not appeal summary judgment on the Dodd-Frank

Act whistleblowing claim.  Judge Jackson also granted summary judgment

on the tort claim of wrongful discharge in violation of Colorado's public

policy upon grounds that Ms. Wagner could not show causation, *i.e.*, that

she could not show that she was terminated in retaliation for complaining

that two co-appraisers were violating federal regulations concerning

appraisals.

Ms. Wagner appeals only the holding that she did not present

evidence of causation to support this state-tort claim.

## *2*    STATEMENT OF THE FACTS

Ms. Wagner worked for Landsafe as a residential home appraiser.

Because appraisers were under scrutiny for having a role in the housing

market crash of 2008, new federal regulations in that industry were

imposed by the Dodd-Frank Act.

The appraisal industry is unique in two ways.  Although Ms. Wagner was an employee of Bank of America/Landsafe,[2] she worked out of her house and only met her direct supervisor of three years, Mr. North, on three occasions and met the supervisor over him, Mr. Vescera (who made the decision to terminate her), only once.  Indeed, she had only a few phone calls or e-mails with Mr. Vescera during the nine months that he was her regional manager.  **See** attestation of Adrienne Wagner, Apdx. 255, ¶ 2.  Second, by regulation appraisers have a good deal of independence.  Because they sign the appraisal, they are responsible (and potentially liable) for the information in the appraisal and, therefore, they must maintain their independence and integrity.  This is discussed below in the Dodd-Frank Act's amendments now codified in the Truth in Lending Act.

Ms. Wagner had been an appraiser since 1986 and worked for Landsafe from April, 2008, through her termination on May 9, 2011.  **See** Apdx. 255, ¶ 1.  She worked from her home, receiving her assignments through e-mails to her computer.  On average, she could do up to two appraisals per day.  *Id.*, 256, ¶ 3.

---

[2] The claim was originally brought against Bank of America, Landsafe Appraisal, and Conrad North.  Ms. Wagner dismissed Mr. North.  For ease of reference, the defendant is referred to as Landsafe because that is the name used by the employees.

The problem that led to Ms. Wagner's termination began with the fact that the work-assignment system often did not provide her enough work to keep her busy.  She knew that two other appraisers were getting more work because their wives were helping them.  When she complained that she was not getting enough work, she concurrently blew the whistle on these two appraisers that they were violating federal law by using their wives to help them.  She based this belief on the following:

> On average, I was able to do 2 appraisals per day.  It was impossible for an appraiser to do 4-5 appraisals per day [the amount of the other two appraisers were allegedly completing] without some type of outside help.  Even though I was a good producer, in the summer of 2010 I was having a difficult time getting enough assignments to keep me busy.  Therefore, I had to call Olga Costillo, my coordinator in Texas, to have her manually assign me work.  At that time, I knew that Mr. Coburn, another appraiser in my district, had approximately 20-30 orders in his queue while I had about one third as many.  Appraiser Modenbach had approximately the same number of orders as did Mr. Coburn.
>
> I spoke to Mr. Coburn during review training and he said that he was often able to do more than 2-3 appraisals per day because his wife helped him do his appraisals.  He told me it was legal, as long as they didn't get caught.  Mr. Modenbach also told me that he was able to do more work because his wife helped him.  My district manager, Mr. North, told me that whenever his appraisers would do more than $25,000 worth of business a month, Mr. North would receive a bonus.

**See** Apdx. 256, ¶¶ 3-4.  Therefore, she specifically knew that the two other appraisers told her they were doing more appraisals because their wives

were helping them and that one even told her "it was legal, as long as they didn't get caught."

On November 22, 2010, she sent an e-mail to her district manager, Conrad North, and to her new regional manager above him, Clay Vescera, raising issues regarding the inequitable work assignments. **See** the e-mail, Apdx. 262-63. In the third to last paragraph of that e-mail, she stated that Mr. Coburn had 20-30 orders in his queue while she was struggling to keep 6-10 orders in her queue. In the next paragraph, she accused the company of allowing Mr. Coburn and the other appraiser (Mr. Modenbach) to use unauthorized people (their wives) to complete their appraisals for them, which is against federal regulations.

> Anyone who has ever been out in the field knows that it is humanly impossible for 1 appraiser to complete more than 2-3 units per day with any consistency and still maintain quality. Furthermore, Uspap[3] severely limits what outside help from unlicensed people, such as wives, is allowable. When wives drive comps, do computer research, write up the reports etc., that is in direct violation of Uspap. So, when upper management at LSA [Landsafe Appraisals] sees appraisers who consistently bill out outrageous numbers, such as over $25,000, or whatever, per month, then upper management must be aware that some unethical business practices are in place. As long as upper management is applauding these appraisers, or even just looking the

---

[3] USPAP stands for Uniform Standards of Professional Appraisal Practices and is a book of regulations regulating appraisals. Apdx. 256, ¶ 5. The Dodd-Frank Act requires people to report appraisers who are failing to comply with USPAP. **See** *infra* at 12-3.

other way, then the company is in reality also in violation of Uspap.  If
this goes on, then LSA management is creating a culture that
encourages unethical business practices.  I hope that is not the case.

*Id.*, page 263.

Ms. Wagner first heard Mr. Coburn talk about his wife helping him in

January, 2009, during a company meeting for training.  She saw her district

manager, Mr. North, and asked him "'do you have any concerns about

that?'  He said, 'I don't know anything about that.'"  **See** deposition of Ms.

Wagner, Apdx. 57, lines 14-16.  A half-year later, in September, 2009, she

sent an e-mail to someone in human resources also complaining about Mr.

Coburn's improper assistance from his wife.  *Id.*, Apdx. 48:15-49:7, and the

e-mail referenced therein, Apdx. 137   There was no follow up regarding

these complaints from either side.

Ms. Wagner heard nothing back either from Mr. North or from Mr.

Vescera on the above e-mail accusation made in November, 2010.

However, she called Mr. Vescera three months later, in the last week of

February, 2011, at which time she again raised the same issue that

appraisers Coburn and Modenbach were using unauthorized, outside help

to complete their appraisals.  **See** Ms. Wagner's attestation, Apdx. 257, ¶ 8.

It was shortly after this phone call that the retaliation began.

Mr. Vescera said that he did not recall whether this February phone call occurred.  **See** deposition of Clay Vescera, Apdx. 269, page 33:7-12. Ms. Wagner specifically recalls the disturbing statement that Mr. Vescera told her that he had no problem with the wives helping the two appraisers because his own wife helped him when he was in the field.  Apdx. 257, ¶ 8. Even though Mr. Vescera does not recall the phone call, he states that he would not have said such a thing.  Apdx. 268, page 32:9-13.

He acknowledges that using wives for these purposes would be a USPAP[4] violation  (*id.*, 267, pages 25:20 – 26:1) and that Ms. Wagner's accusation was serious (*id.*, page 28:3-5).  He says that he looked into the billings of the two appraisers and found nothing.  *Id.*, 266, page 23:12-20.

As stated above, appraisers work independently, out of their homes. Ms. Wagner only met Mr. North three times over her three years of working with him.  She met Mr. Vescera only once.[5]  **See** Apdx. 255, ¶ 2.  Mr. Vescera did not move into his position above Mr. North until October, 2010 (Apdx. 265, page 10:15-17)*,* and, after that, she did not often communicate with him either by phone or by e-mail.  **See** Apdx. 255, ¶ 2.

---

[4] **See** footnote 3.

[5] Mr. Vescera did not recall meeting Ms. Wagner.  Apdx. 265, page 9:16-22.

The person that she had the most regular contact with was Susan Schroeder, one of Landsafe's internal auditors.  **See** Apdx. 257, ¶ 9.  She would either call or e-mail Ms. Schroeder approximately 5-10 times per month to get advice or run by certain ideas on how to handle a particular appraisal problem.  *Id.*  Because of this regular contact, she believed she had a good relationship with Ms. Schroeder.  *Id.*  Ms. Schroeder agreed.  **See** Apdx. 254, page 56:2-4.  Hence, this made the alleged dispute with Ms. Schroeder, which led to Ms. Wagner's termination (discussed below), a complete surprise to Ms. Wagner.  Apdx. 257, ¶ 9.

An appraiser is a licensed position.  *Id.*, 255, ¶ 1.  Appraisers are required to follow numerous rules and to maintain their independence and integrity in making the appraisal.  They must do all of the work themselves, such as the site visit, research, and looking up comparable sales.  *Id.*, 256, ¶ 5.  They are trained to be sensitive to undue influence.  *Id.*  Even though Landsafe has its own internal auditors and reviewers, they can only make suggestions to the appraiser on how to value the property; the auditor may not direct the appraiser not to use a certain comparable, for instance.  *Id.*, 257, ¶ 6.  If the appraisal does not meet Landsafe's standards, after

Landsafe makes suggestions to the appraiser, the only remedy is not to accept the appraisal and to assign it to a different appraiser.  *Id.*

The public policy behind these rules is easy to see – if appraisers bow to outside pressures to reduce or increase the value of the property to satisfy a buyer or seller, this creates a false value.  Therefore, the independence and integrity of appraisers are part of their culture.  This was also required by the Dodd-Frank Act passed on July 10, 2010.

The Dodd-Frank Act established the integrity of appraisals as a matter of law.  Subtitle F of the Dodd-Frank Act (§1472), found at Public Law 111-203, July 21, 2010,[6] amended the Truth in Lending Act (15 U.S.C. §1631) by inserting after 129D the following new section, §129E, concerning appraisal independence requirements (codified in the Truth in Lending Act, 15 U.S.C. §1639e).  The amendment stated that it was unlawful "to engage in any act or practice that violates appraisal independence as described in or pursuant to regulations prescribed under this section."  **See** 15 U.S.C. §1639e(a).  Subsection §1639e(e) provides the following mandatory reporting:

---

[6] The Dodd-Frank Act is a scattered act and, hence, its provisions are codified in some 11 locations throughout the United States Code.  The applicable part of the Dodd-Frank Act is now codified in the Truth in Lending Act.

Any … other person involved in a real estate transaction involving an appraisal in connection with a consumer credit transaction secured by the principal dwelling of the consumer who has a reasonable basis to believe an appraiser is failing to comply with the Uniform Standards of Professional Appraisal Practice [USPAP], is violating applicable laws, or is otherwise engaging in unethical or unprofessional conduct, shall refer the matter to the applicable State appraiser certifying and licensing agency.

Ms. Wagner's problems with Mr. Vescera began shortly after the February, 2011, phone call in which she again complained the two other appraisers were getting more work because their wives were doing some of the substantive appraisal work for them.  A few weeks after that call, on March 14, 2011, Mr. Vescera gave Ms. Wagner a final written warning concerning her "inappropriate behavior."  **See** the final written warning, Apdx. 276.  That issue concerned whether she needed to provide a live photo for an REO appraisal or whether she could use a file photo.  **See** Apdx. 258**,** ¶ 10.  An REO appraisal stands for "real estate owned" which is generally an appraisal for lender-owned properties following a foreclosure. *Id.*  There are usually more comparables needed for an REO appraisal than there are for a typical single-family refinance and the process involves such things as researching the cost to repair the property.  *Id.*  For the prior

three years, Ms. Wagner had always used an MLS[7] photo as unsold comparables for such appraisals.  *Id.*  Mr. Vescera insisted that she return to the property to take a series of "live" photos for these comparables before Landsafe would accept the appraisal.  *Id.*, ¶ 11.

Ms. Wagner told Mr. Vescera that for the prior three years, she had always used an MLS photo and she now objected to him requiring her to return to the site to take a live picture, because her appraisal had been completed.  *Id.*, ¶ 10.  She did, however, agree to take live photos in the future.  *Id.*, ¶ 11.  She only objected to having to make a return trip to the site to take the photos because this would add 2-3 hours to the job or 40% of the time to complete the job.  *Id.*  Again, this is in the context of appraiser independence where, in the end, because Ms. Wagner signed the appraisal, she was in control of what went into it.  Under this principle, Landsafe could not tell her what to do; it could only refuse to accept the appraisal.  *Id.*, 257, ¶ 6.

Mr. Vescera admits that he did not check Ms. Wagner's prior REO appraisals to see if, indeed, she had used MLS photos previously.  **See** Apdx. 269, page 34:1-6.  Nor did he check with the other appraisers to see

---

[7] MLS stands for Multiple Listing Service, the service used by realtors to list properties for sale.

what their practice was.  *Id.*, 270, page 44:3-10.  Instead, he assumed that that was the policy at the time, that is, prior to March 14, 2011.  *Id.*

However, according to Ms. Schroeder, the regional chief appraiser, the policy regarding such photos was changed in a memo dated April 29, 2001,[8] *after* the final warning of March 14.  **See** Apdx. 249, page 21:10-22 and page 22:15-19.  Therefore, the evidence supports the fact that Ms. Wagner was correct in understanding the policy as of March, 2011, and that Mr. Vescera was simply trying to "push her buttons" to get the desired "inappropriate behavior" referenced in the final warning (found at Apdx. 276).

Ms. Wagner alleges that Mr. Vescera, who was now looking for an excuse to terminate Ms. Wagner, knew of Ms. Wagner's assertiveness from her November complaint (Apdx. 263).  He used this to manufacture a situation to provoke Ms. Wagner into "inappropriate behavior" after she raised again the "wife issue" in the February phone call.

Ms. Wagner had never received any kind of a warning, written or not, in her prior 27 years as an appraiser.  **See** Apdx. 258, ¶ 12.  The warning opened with "[t]his is a final written warning to address your inappropriate

---

[8] The e-mail advising of the change is deposition exhibit 32, Apdx. 277.  It says that the change was effective on April 29, 2011.

behavior" and ended with "[f]ailure to meet expectations may result in further disciplinary action up to and including termination."  **See** the warning, Apdx. 276.

Nothing else happened until about six months later, on around April 26, 2011, an internal reviewer,[9] Randall Wagner (no relation), called Ms. Wagner to ask her to change two informational comparables to verified closed comparables for purposes of calculating the value of a refinance. **See** Apdx. 259, ¶ 13.  Mr. Wagner suggested that because they were listed as closed in the MLS, she could consider them as closed and use them and her calculations.  Ms. Wagner told him that this would violate a Fannie Mae regulation because they could not be considered as closed until the county clerk recorded them as closed.  She suggested that if he could wait a day or two, the two comparables would be verified as closed by the county clerk and Ms. Wagner would then use them in her calculation.  **Id.** Later that day, Ms. Wagner confirmed this practice (that an appraiser could not rely upon the MLS that a sale was closed) with one of her USPAP instructors.  **Id.**, ¶ 14.

---

[9] The company does random internal audits or reviews for quality control. **See** Apdx. 257, ¶ 6.

A few hours after the Randall Wagner call, also on April 26, Ms. Schroeder called Ms. Wagner about the same topic.  *Id.*  Ms. Schroeder said that she took the review from Mr. Wagner, which was not her normal practice, because he purportedly could not communicate with Ms. Wagner on this topic.  Apdx. 250-51, pages 32:20-33:3.  At any rate, Ms. Wagner and Ms. Schroeder agreed to wait a few days until the closings were recorded.  **See** Apdx. 259, ¶ 14.  Thus, the issue was resolved.

Ms. Schroeder did not complete the review which, apparently, was abandoned.  Instead, eight days later she simply wrote, to use district manager North's term, an e-mail.  **See** Apdx. 274, pages 58:23 – 59:1.  By this time, the two or three days had passed and Ms. Wagner had completed the appraisal, using the comparables that had now been recorded by the county clerk.  This e-mail chain is critical because Mr. Vescera purportedly terminated Ms. Wagner for her "unprofessional conduct" in the eighth e-mail of this e-mail chain started by Ms. Schroeder. **See** Apdx. 278, the e-mail chain.

In the first e-mail, Ms. Schroeder pasted into the e-mail a USPAP standard accusing Ms. Wagner of creating a "misleading or fraudulent report."  *Id.*, 283, e-mail #1, ¶ 6.  Again, this concerned comparables #4

and 5 which Ms. Wagner had eight days earlier reported as pending sales and not as closed sales  At that time, that is, eight days earlier, Ms. Wagner and Ms. Schroeder had agreed to wait a few days for the sales to be recorded and, then, Ms. Wagner would change their status from pending sales to closed sales in her appraisal (which she did).  Notwithstanding that this issue had been resolved several days earlier, on May 4 Ms. Schroeder accused Ms. Wagner of misleading or fraudulent conduct on this very point when she quoted the USPAP Standard, #2-1:

> Development of the report – Each written or oral report must (a) clearly and accurately set forth the appraisal in the manner that will not be misleading…
> ETHICS RULE – Conduct – an appraiser must not communicate assignment results in a misleading or fraudulent manner.  An appraiser must not use or communicate a misleading or fraudulent report …

**See** Apdx. 283, ¶ 6.

Mr. Vescera (the supervisor who terminated Ms. Wagner for her reaction to this accusation) agreed that accusing an appraiser of fraud is a serious accusation.  Apdx. 275, page 61:7-11.  Ms. Schroeder stated that she had never cited an ethics rule to someone being reviewed (Apdx. 252, page 45:18-20) and does not know why she cited it in this instance (***id.***, lines 14-17).  She claims that she was not accusing Ms. Wagner of fraud

(*id.*, page 45:21-24), but admits that she can understand how Ms. Wagner thought she was being so accused.  *Id.*, page 46:5-7.

Mr. Ormisten, an expert retained in this case, concurred that Ms. Wagner was correct in believing that she could not use the MLS to confirm that the sale had been closed.  He said that a listing of a sale in the MLS, by itself, is generally not enough to verify a closed sale for purposes of using an active-listing comparable in a calculation regarding an REO appraisal.  **See** attestation of Lee Ormiston, Apdx. 285, ¶ 2.  A more common practice among the peers in Colorado is to call the realtor to determine what factors affected the sales price.  Appraisers also often read the deed to see what items the sales price included.  *Id.*

Mr. Ormiston reviewed the May 4, 2011, e-mail from Ms. Schroeder to Ms. Wagner, and said that in the appraisal business, he would consider this to be inflammatory and abusive on the part of Ms. Schroeder, designed to elicit an angry response.  *Id.*, ¶ 3.  In short, Ms. Schroeder was accusing Ms. Wagner of fraudulent conduct simply because Ms. Wagner wanted to wait a few days before changing a pending sale of a comparable property to a closed sale.  This accusation was inflammatory.  If Mr. Ormiston were

19

to receive an e-mail like this, he said that he would have to take a walk just to settle down from the insult.  *Id.*

Ms. Wagner's first response to Ms. Schroeder's accusation that Ms. Wagner was acting fraudulently was "[p]lease reopen the report.  I will be happy to add additional comments as requested."  **See** e-mail #2, Apdx. 281.  The report was reopened so Ms. Wagner could modify it and, in so doing, she sent comments back to Ms. Schroeder ending with "even though I am in disagreement about some of your statements, you also have some good suggestions for clarification.  I will keep them in mind for the future.  Thanks."  *Id.*, e-mail #4, last ¶.  In other words, her response was polite and non-confrontative.

But Ms. Schroeder would not let the matter drop and responded with a query as to whether the "play court" adjacent to the property had any impact on the marketability of the subject property.[10]  *Id.*, e-mail #5.  Ms. Wagner responded with "I can't prove any, can you?"  *Id.*, e-mail #6.  Ms.

_____

[10] Attached to Ms. Wagner's attestation is an overhead photo of this adjacent property.  **See** Apdx. 260, ¶ 16, and Apdx. 261.  The house being appraised is marked with a 1 on its roof, the play court is marked with a 2, and the house that owns the play court is marked as 3.  Thus, the play court acts as the backyard for house 3.  It would also provide an undeveloped space to the north of the house being appraised, which would be an attraction (not a nuisance).

Schroeder responded that it was not her "responsibility to 'prove' anything

… it is your responsibility to, at the bare minimum to discuss play court with

lights next door and that there is not market data to support a downward

external obsolescence adjustment [*sic.*] due to a 'nuisance' impact."  ***Id.***, e-

mail #7.  This was a refinance, *i.e.*, the person requesting the loan lived in

the house and knew about the play court next door.  There was no

indication that such an open space would lower the value of the house

being refinanced.

Up until this point, Mr. Vescera agreed that there was no reason to

have terminated Ms. Wagner for "inappropriate behavior."  **See** Apdx. 274,

pages 57:16 – 58:1.  Rather, he claims that the following response from

Ms. Wagner was the justification for termination (***id.***):

> I would like to remind you, Susan, to be careful about making false
> and malicious accusations against appraisers.  Under the Rule of
> Law in this country, the burden of proof is upon you, my accuser.
> Any more accusations about fraud can cause you serious legal
> consequences.

**See** Apdx. 278, e-mail #8.  In short, Ms. Schroeder tried to provoke Ms.

Wagner by quoting the USPAP standard to insinuate that Ms. Wagner was

committing fraud.  Ms. Wagner at first let that pass without comment, but

then Ms. Schroeder persisted that it was Ms. Wagner's responsibility to

explain why the "play court" in the next door lot would not drag down the value of the subject property, even though there was no indication that an "open" lot next door would hurt the property value. It was in response to this last comment that Ms. Wagner returned to Ms. Schroeder's initial accusation of fraud against Ms. Wagner.

Ms. Schroeder had copied Mr. North and Mr. Vescera (with Mr. North first) on e-mail #1, but Ms. Wagner, in her reply (e-mail #2) took the two men off the cc list. They were not copied on any e-mail through #6. Ms. Schroeder then copied Mr. Vescera and Mr. North (now putting Mr. Vescera first) on e-mail #7, but Ms. Wagner took them off the copies on e-mail #8, the objectionable e-mail. Ms. Schroeder sent e-mail #9, and the rest of the e-mail chain, to Mr. Vescera and Mr. North (with Mr. Vescera again first). **See** Apdx. 278, e-mail #9. This cc list supports Ms. Wagner's theory that she was trying to keep the discussion between the two of them confidential, while Ms. Schroeder was under instructions to copy Mr. Vescera with any damning evidence.

The stated reason for Ms. Wagner's termination is set forth in the e-mail, found at Apdx. 287. **See** Apdx. 271-2, pages 48:18 – 49:7, where Mr.

Vescera identifies deposition exhibit 30, found at Apdx. 287, as setting forth

the reason for the termination.  In that e-mail, he says the following:

> Just a heads up that we are moving to termination with Adrienne
> Wagner.  See the e-mail chain below.

> After reading the following blurb, I felt it was prudent to get Advice &
> Counsel involved, as Adrienne was creating a hostile work
> environment for Susan [Schroeder], and her words made it
> impossible for Susan to adequately do her job without threat of legal
> recourse.

He did not speak to Ms. Schroeder as to whether Ms. Wagner had actually

created a hostile work environment for Ms. Schroeder.  **See** Apdx. 273,

page 53:9-12.  Rather, Mr. Vescera said that the term "hostile work

environment was from Advice & Counsel."  **Id.**, lines 20-21.  In other words,

Mr. Vescera was building a case against Ms. Wagner without even

checking to see if the facts were correct.  Ms. Schroeder herself said that

she could have continued working with Ms. Wagner.  **See** Apdx. 254, page

54:2-4.  Although Ms. Schroeder thought that Ms. Wagner may have

created a momentary hostile work environment, she also acknowledged

that "we all have disagreements."  **Id.**, line 9.  She had no opinion on

whether Ms. Wagner should have been terminated.  **Id.**, page 53:23-25.

She was not afraid of the alleged legal consequences referenced in Ms.

Wagner's e-mail.  **Id.**, 253, page 51:19-21.

Mr. Vescera had previously terminated only two other employees. One employee was terminated for working for another client, *i.e.*, for moonlighting, and the other employee was terminated for poor performance. That second employee was given three warnings before termination. **See** Apdx. 270, pages 42:21 – 43:24. Ms. Wagner was given only one warning (Apdx. 276), which, as stated above, was suspect because she was being told to redo her appraisal (and lose money doing so) to do something that she had not been asked to do the prior three years.

Ms. Wagner claims that the reason given for her termination (creating a hostile work environment for Ms. Schroeder) was a pretext. In addition, she claims that Mr. Vescera and Ms. Schroeder manufactured the situation to elicit "inappropriate behavior" as an excuse to terminate Ms. Wagner. The facts supporting her theory are summarized as follows:

1. In November, 2010, Ms. Wagner complained to Mr. Vescera that two appraisers were using their wives to do appraisals. One appraiser told her it was only legal if they didn't get caught. She knew that one of these appraisers had 20-30 appraisals in his queue while she struggled to keep one third of that amount. Mr. Vescera did not respond to this.
2. Three months later, in February, 2011, Ms. Wagner raised the issue again in a telephone conversation with Mr. Vescera and Mr. Vescera told her that he did not see that using the wives would be a problem. In fact, he admitted that he had done this himself.

3. Three weeks later, Ms. Wagner was given a final written warning for "inappropriate behavior." In fact, this behavior, at bottom, was for following Landsafe's procedures regarding the use of an MLS photo and for Ms. Wagner resisting a retroactive change, although she agreed to the change in the future.

4. Five weeks later, Ms. Schroeder interceded in a review but did not complete it. Instead, eight days after-the-fact she did an e-mail critique, accusing Ms. Wagner of fraud. After Ms. Schroeder accused Ms. Wagner of shirking her responsibility in not commenting on an alleged nuisance, Ms. Wagner warned Ms. Schroeder not to accuse her of fraud.

5. Mr. Vescera terminated Ms. Wagner upon grounds that she created a hostile work environment for Ms. Schroeder, notwithstanding the fact that Ms. Schroeder said that she could still work with Ms. Wagner.

The trial court granted summary judgment on both the federal and state claims. The issue regarding the federal claim was whether Ms. Wagner was a whistleblower under the whistleblower provision of the Dodd-Frank Act. The trial court ruled that she was not a Dodd-Frank whistleblower and Ms. Wagner does not challenge that ruling on appeal.

The trial court also granted summary judgment on the state tort of wrongful discharge in violation of Colorado's public policy upon a finding that Ms. Wagner could not prove that her whistleblowing was a cause of her termination. It made the following findings concerning causation:

> … I find that Ms. Wagner has provided no evidence that there were any USPAP violations. What she knows, and I will assume for this purpose is true, is that Mr. Modenbach told her in 2008 that he was receiving assistance from his wife, and that in 2009 she overheard Mr. Colburn tell another person that he too received

assistance from his wife.  Ms. Wagner does not know, nor apparently did she make any effort to discover, what that assistance was.  She acknowledges, and frankly common sense would tell us, that there are some things that a spouse could do that would not cause the appraiser to violate any professional standard.  Ms. Wagner does nothing more than assume, based on what she believes have been the volume of work that the two appraisers were doing, that they must have had significant and inappropriate assistance.[11]  The facts do not bear out even that speculation.  When, in response to one of Ms. Wagner's complaints about the two appraisers her supervisor investigated, it turned out that Mr. Modenbach was doing less work than Ms. Wagner, and Mr. Coburn was billing only slightly more.[12]

But I am willing to assume that if Ms. Wagner had a sincere and rational belief that there were USPAP violations occurring, and reported her suspicions to her supervisors, and was fired because of those reports, there might be some "whistleblowing" protection for her….  The fundamental flaw in this claim that overwhelms everything else is that she has no evidence that those reports or complaints caused or contributed to her termination.  When asked in her deposition what connects those complaints in her mind to her termination, she answered "the timing," and only the timing.  [Citation omitted.]  That's it.  She complained about the fellow appraisers' "admissions" on four occasions between 2009 and 2011 – the same admissions which had occurred in 2008 (Modenbach) and 2009 (Coburn).  She wasn't fired or, so far as the record discloses, otherwise disciplined because of those complaints after any of those four occasions.[13]

---

[11] The trial court overlooked Mr. Coburn's statement to Ms. Wagner that "it was legal, as long as they didn't get caught."  Apdx. 256, ¶ 4.

[12] This referred to Mr. Vescera's alleged investigation of Ms. Wagner's allegations.  The trial court did not mention the fact that Mr. Vescera had no documentation or confirming evidence that he had actually done an investigation.

[13] The first two occasions were in 2009 when Ms. Wagner complained to Mr. North and to the human resources person.  The last two occasions

The last such complaint was made in February 2011, but she was not terminated until May. The undisputed facts show that Ms. Wagner had been counseled and warned numerous times during her employment about her tone and email communications. Despite these warnings, she sent an email that her managers deemed inappropriate in March 2011 and was issued a "final written warning." After receiving this final written warning, Ms. Wagner sent another accusatory email in May 2011. Her manager, Mr. Vescera, determined that this was a violation of the final written warning and terminated her employment.

**See** attached Order, pages 12-13.

## IX.  SUMMARY OF ARGUMENT

The issue on appeal concerns causation in a state tort – a wrongful discharge in violation of Colorado's public policy. Under controlling state law, if the employee establishes a *prima facie* case that she was wrongfully discharged, the employer's proposed legitimate reason for terminating the employee creates a factual question of causation, not susceptible to summary judgment. **See *Webster v. Konczak Corp*.**, 976 P.2d 317, 321 (Colo. App. 1998). This Court has endorsed that reasoning in ***Barlow v. C.R. England, Inc***., 703 F.3d 497, 507 (10th Cir. 2012). Ms. Wagner did not need to show that there was an actual USPAP violation in order to prove that she was whistleblowing. She only needed to show that she had

---

were the November, 2010, e-mail and the telephone conversation with Mr. Vescera in February, 2011.

a reasonable belief that a USPAP violation had occurred. Because Ms.

Wagner submitted sufficient evidence for a *prima facie* case of wrongful

discharge in violation of Colorado's public policy (through the timing of the

retaliation and her theory that the bases for the warning and for the

termination were manufactured), the issue of causation must go to a jury.

## *2* ARGUMENT

Colorado recognizes that whistleblowing, on matters of public concern,

is a protected activity. This Court stated in ***Barlow v. C.R. England, Inc***.,

703 F.3d 497, 507 (10th Cir. 2012), that there are the following four

elements to the *prima facie* case in a wrongful discharge in violation of

Colorado's public policy (modified to fit the instant facts):

1. That Landsafe retaliated against Ms. Wagner because her whistleblowing was in furtherance of a public duty,
2. That this retaliation violated a specific statute relating to the public welfare or undermined a clearly expressed public policy relating to the employee's basic responsibility as a citizen,
3. That Ms. Wagner was terminated as result of her whistleblowing, and
4. That Landsafe was aware that Ms. Wagner's whistleblowing was based on her reasonable belief that the actions of her co-appraisers were contrary to clearly expressed statutory policy.

**See also *Martin Marietta Corp. v. Lorenz***, 623 P.2d 100, 109 (Colo.

1992).

### 2   Ms. Wagner's actions implicated public policy

Federal law puts a duty on Landsafe, as well as on Ms. Wagner, to report any USPAP violations.  Under **Lorenz**, 823 P.2d at, "[t]he essence of the public-policy exception is that an employee will have a cognizable claim for wrongful discharge 'if the discharge of the employee contravenes a clear mandate of public policy' [such as] the employee's 'whistleblowing' activity or other conduct exposing the employer's wrongdoing."  **See also Kearl v. Portage Environmental, Inc**., 205 P.3d 496, 499 (Colo. App. 2008)("Colorado is in line with the number of other jurisdictions that shield whistleblowers from retaliatory discharge"); **Haynes v. Poudre Valley Health Care**, 2011 WL1225590, *4 (D. Colo. 2011)(Judge Daniels stated that a respiratory therapist's complaint that another respiratory therapist was a danger to the public health would receive whistleblower protection under Colorado law); and **Stoney v. Cingular Wireless LLC**, 2008 WL 4371942, *9 (D. Colo. 2008).

This type of whistleblowing is protected under Colorado's common law because it concerns a matter of substantial importance to the public's welfare.  As the Court stated in **Flores v. American Pharmaceutical Services, Inc**., 994 P.2d 455, 459 (Colo. App. 1999), a statutory statement

that insurance fraud needs to be opposed, even though the statute did not

explicitly require employees in the industry to report such fraud, "serves the

public interest and justifies interference with defendant's business decision

to retaliate against plaintiff for performing her obligation to expose

suspected insurance fraud."

In **Flores**, the employer argued that the statute did not create any

duty to report but merely set forth a general public policy:

> [D]efendant asserts that the statute on which plaintiff relies created
> no specific duty on her either to do or not do anything, and that
> plaintiff did not contact any government or law enforcement agency or
> insurance company about the suspected fraud.  Therefore, defendant
> contends that, even if plaintiff was terminated for reporting to her
> employer and investigating the fraud alleged to have been
> perpetrated by a co-worker, there remains nothing specific in the
> statute relied on and no actions taken specifically in compliance
> therewith on which a claim for wrongful termination can be based.
> We disagree.

**Id.**, at 459.  Thus, the importance of the statutory declaration is to show

that the legislature had identified an issue of public interest.  In the instant

case, Congress identified that ensuring proper housing appraisals are in

the public interest.

Likewise, a statutory requirement that employees in the gaming

industry report suspected gaming violations was of sufficient importance to

support a claim of wrongful discharge in violation of Colorado's public

policy:

> [W]e view these policies as fully supporting the conclusion that the retaliatory discharge of an employee for reporting a suspected violation of the Limited Gaming Act or the regulations is of sufficient gravity that may provide the basis for a claim for relief.

*Webster v. Konczak Corp.*, 976 P.2d 317, 320 (Colo. App. 1998).

This is contrasted to *Crawford Rehabilitation Services, Inc. v.*

*Weissman*, 938 P.2d 540 (Colo. 1997), which concerned a Wage Order

providing for a 10-minute rest period for the employee.  The employee

claimed that she was terminated in retaliation for asserting this regulatory

right.  Nonetheless, the Supreme Court stated that the interest she

> may have pursuant to the Wage Order in taking ten minute rest breaks does not rise to the level of a public-policy mandate susceptible to private enforcement.
>     Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment.

938 P.2d at 553.  That is, the dispositive principle often is not the source of

the public policy (the legislature or some other source) but, rather, the

importance or gravity of it.

Under these principles, the amendments to the Truth in Lending Act

that violations of USPAP need to be reported support the fact that the

public policy at issue is important enough to support the tort.  Indeed, these

31

regulations were recognized by Congress to help prevent a housing crash

similar to what the country suffered in 2008. In terms of our country's

economy, it is difficult to identify a higher public policy. Thus, Ms. Wagner

satisfied elements one and two of her *prima facie* case.

### 2. Landsafe Knew that Ms. Wagner Believed She was Reporting Illegal Conduct

The fourth element concerns whether the employer was aware that

Ms. Wagner's whistleblowing was based upon **her** reasonable belief that

there was illegal activity. Thus, to the degree that the trial court dismissed

the claim upon its understanding that Mr. Vescera's investigation did not

reveal any wrongdoing, that was the wrong focus. Rather, the focus

regarding this element is upon the employee's good faith belief, not upon

the employer's good faith belief. **See also *Bertsch v. Overstock.com***,

684 F.3d 1023, 1029 (10th Cir. 2012)(in a Title VII retaliation case, the

employee "need only have a reasonable good-faith belief she is opposing

discrimination").

Mr. Vescera claims that he investigated Ms. Wagner's allegations

against the two appraisers and admits that these allegations involved a

serious concern. However, he had no memo, no e-mail, nor any other type

of documentation showing that he actually investigated the allegations. In

light of the fact that he told Ms. Wagner, after he allegedly did the investigation, that he himself did not see a problem with such assistance because he and his wife had done the same thing, this raises doubt as to whether he actually investigated the matter, especially where there is no documentation that he actually investigated the matter.

Furthermore, there is no requirement that Ms. Wagner prove an actual violation of USPAP.  The Truth in Lending Act only states that she must have "a reasonable basis to believe an appraiser is failing to comply with the Uniform Standards of Professional Appraisal Practice."  **See** 15 U.S.C. §1639e(e).  The employer raised the same issue in **Webster**, but the court stated that it "is unnecessary for [the whistleblower] to prove an actual statutory violation."  **Webster**, 976 P.2d at 320.

Landsafe has a facially stronger argument that after-the-fact, in discovery, it was allegedly determined that the other two appraisers had approximately the same number of appraisals as did Ms. Wagner.  That was a point upon which Judge Jackson focused.  However, under the above reasoning, this is irrelevant.  The only relevant question was whether Ms. Wagner reasonably believed, given the facts presented to her, that there was a USPAP violation which need to be investigated.

Ms. Wagner presented sufficient evidence to satisfy the *prima facie* case that she had a reasonable basis to believe that the appraisers were violating the Truth in Lending Act premised upon the following:

1. The appraisers told her that their wives were helping them.
2. In November, 2010, Ms. Wagner knew that Mr. Coburn had 20-30 orders in his queue, while she was struggling to keep 6-10 orders in her queue, and there was no way Mr. Coburn could do that number of appraisals without substantive help from someone (*i.e.*, his wife).
3. Mr. Coburn said it was legal, but only if he did not get caught – thus admitting that he was doing something illegal.
4. Mr. Vescera told Ms. Wagner that he did not see a problem with it because he had done it himself with his wife.

All of these establish Ms. Wagner's reasonable belief that there was a violation of the appraiser's independence under the Truth in Lending Act.

Indeed, the trial court itself said that it was "willing to assume that if Ms. Wagner had a sincere and rational belief that there were used at violations occurring, and reported her suspicions to her supervisors, and was fired because of those reports, there might be some 'whistleblowing' protection for her." **See** Order, page 13. Therefore, absence of evidence to support this element was not a valid basis for summary judgment; rather, the issue upon which the trial court granted summary judgment was causation.

### *3. Causation Could Only Be Resolved by a Jury*

The third element is causation.  To be clear, there is no dispute that Mr. Vescera terminated Ms. Wagner.  The only dispute is why he terminated her, that is, the dispute concerns his intent.  The trial court stated that Ms. Wagner could only speculate as to his intent.  First, the court noted that Ms. Wagner had brought the improper appraiser conduct to the attention of Mr. North and to a person in human resources in 2009, but nothing happened to Ms. Wagner at that time.  **See** Order, page 13.  Second, the court noted that Ms. Wagner's last complaint regarding the issue occurred in the end of February, 2011, but she was not terminated until 2½ months later in early May.  *Id.*  Under the circumstances of the instant case, the first fact is irrelevant and the second concerns a factual dispute that only a jury may resolve.

The first point concerned Ms. Wagner's two prior complaints (1) to Mr. North and (2) to the human resources person.  Mr. North's only comment was that he knew nothing about whether the other appraisers were using their wives or not.  Thus, a jury could conclude that Mr. North simply brushed this allegation to the side.  Second, it is not even clear whether the human resources person knew that such whistleblowing

concerned activity that would violate regulations – there is no indication that this person would even know such regulations existed.[14]  But, more importantly, neither one of those people was the decision maker in this case and, hence, notice to them does not affect Mr. Vescera's intent.

The decision maker was Mr. Vescera and he did not hear about the whistleblowing until the e-mail in November, 2010.  He said that he looked into the allegation and determined there was no merit to it.  But, he had no documentation reflecting this investigation notwithstanding the fact that he admitted that Ms. Wagner's allegation was a serious allegation.

Ms. Wagner raised the issue again in a telephone call with Mr. Vescera toward the end of February, 2011.  According to Ms. Wagner, Mr. Vescera said in this phone call that he did not see that using one's wife to help in the appraisal was any problem.  He allegedly said this after he had investigated the matter following the November e-mail three months earlier. Obviously, he would not have told Ms. Wagner that he had done this himself if he thought that it was an offense he should investigate. Therefore, one of Mr. Vescera's statements is not true.

---

[14] Indeed, the e-mail exchange showed that the human resources person told Ms. Wagner to take up the matter with Mr. North, her supervisor.  **See** Apdx. 137.

Of course, Mr. Vescera denies ever saying this, but that is an issue that could only be resolved by the jury. If the jury believes Ms. Wagner on this point, this is good circumstantial evidence that Mr. Vescera realized that Ms. Wagner was causing problems and it was best to get rid of her. Three weeks after this telephone call, Mr. Vescera began building the case to have Ms. Wagner terminated, first by issuing the final warning.

Thus, when Ms. Wagner stated that her proof of the retaliation comes down to the timing (**see** Order, page 13), she was referring to this timing. She was asked at the end of her day-long deposition why she believed that her whistleblowing caused her termination. She answered

> A. Haven't we talked about that *for the last eight hours*?
> Q. I take it it's your opinion that your termination was because of or caused by those reports.
> A. Correct.
> Q. Okay. What connects those two things in your mind?
> A. The timing.
> Q. Any other than timing?
> A. No right now, timing.

Apdx., page 126, lines 1-11 (emphasis added). By referring to her testimony over the last eight hours, she made it clear that the timing concerned what she had talked about for the last eight hours, *i.e.*, what she considered to be the pretextual reasons both for the final warning and for her termination.

Under Ms. Wagner's theory of the case, the timing of the retaliation supports her claim.  As this Court pointed out in **_Lockheed Martin Corp. v. Administrative Review Board_**, 717 F.3d 1121, 1137 (10th Cir. 2013), "when evaluating temporal proximity for purposes of determining whether [the employee's] protected activity was a contributing factor in her constructive discharge, the relevant time frame is not when the constructive discharge occurred, but when the conduct leading up to the discharge began."  The conduct leading up to Ms. Wagner's discharge began with her final written warning issued just three weeks after her phone call with Mr. Vescera when she claims he told her that the wives' help in doing the appraisal was not an issue because he had done it himself previously.

There are clearly factual issues regarding Mr. Vescera's intent behind the final written warning and behind the termination.  This was the essence of Ms. Wagner's theory of the case.  She presented competent evidence that the events leading up to the final warning and leading up to the termination were designed to evoke exasperation from Ms. Wagner so that her exasperation could be used as an excuse to terminate her.

Landsafe argued that it had previously counseled Ms. Wagner on her e-mail tone.  **See** Apdx. 12-13, ¶¶ 12-16, and the record cited therein.

First, these were relatively minor matters at the time and Landsafe never indicated that Ms. Wagner's job was in jeopardy until the final warning at issue herein.  At that time, Ms. Wagner wrote "How can this be my 'final written warning for termination' when I never had any warning, written or otherwise, previously?"  Apdx. 176, ¶ 3.  Second, Ms. Wagner submitted sufficient evidence to show that the two incidents leading to her termination were manufactured to be used as an excuse to terminate her.  Therefore, Landsafe used an excuse available to it (that is, it did not terminate Ms. Wagner for lack of production or tardiness or some other issue not already in her record).

If the final written warning and the termination did not have several indices of pretext, Ms. Wagner would not have an argument.  However, because she presented evidence that they were manufactured, this brings the issue of intent into play.  For instance, Mr. Vescera gave the final written warning to Ms. Wagner for failing to follow a Landsafe policy when the documentation showed that that Landsafe policy came into being six weeks later.  He terminated Ms. Wagner because she allegedly made Ms. Schroeder's work conditions unbearable, even though Ms. Schroeder stated that was not true.

Of course, Landsafe disagrees with this theory and maintains that it did nothing to provoke Ms. Wagner.  A fundamental principle of summary judgment law is that both sides should be allowed to substantiate their theory with admissible evidence and, if there is a dispute regarding the underlying intent (as Ms. Wagner asserts herein), the trial court may not resolve the dispute short of trial.  Indeed, this factual issue is part and parcel of Landsafe's own argument that Ms. Wagner's e-mail exhibited unprofessional conduct substantial enough to merit a termination.  In a different work environment, such an e-mail may not have raised an eyebrow.  For instance, in a brief before this Court, reminding the other side of one's burden of proof[15] would be proper conduct.

It is only fair to allow Ms. Wagner to argue that Ms. Schroeder's e-mail was unprofessional and improperly designed to elicit Ms. Wagner's emotional response if Landsafe is allowed to make the mirror argument against Ms. Wagner.  Indeed, Mr. Ormiston, the expert, stated that "[i]f I

---

[15] In the allegedly objectionable e-mail, Ms. Wagner told Ms. Schroeder that "I would like to remind you, Susan, to be careful about making false and malicious accusations against appraisers.  Under the Rule of Law in this country, the burden is upon you, my accuser.  Any more accusations about fraud can cause you serious legal consequences."  Apdx. 278, e-mail #8.

were to receive an e-mail like this, I would have to take a walk just to settle

down from the insult."  **See** attestation of Ormiston, Apdx. 285, ¶ 3.

Clearly, the design behind the e-mail is a factual issue that only a jury may

resolve.

Colorado recognizes[16] that these types of claims are almost always

proved by reasonable inferences arising from circumstantial evidence:

> It has long been settled that in cases involving intentional
> discrimination, direct evidence of discrimination is rare.  We have
> noted that "the facts necessarily vary in these cases, and the
> specification … of the prima facie proof required from [the plaintiff] is
> not necessarily applicable in every respect to different factual
> situations."  [Citations omitted.]  Thus, we recognize that employees
> must often rely on indirect evidence and reasonable inferences to
> establish a case of discrimination under the **McDonnell Douglas**
> analysis.

**Bodaghi v. Department of Natural Resources**, 995 P.2d 288, 296 (Colo.

2000).  Colorado also recognizes that summary judgment is a drastic

remedy and that the rules are designed to encourage a trial and not to

resolve the matter summarily:

> Summary judgment is a drastic remedy and is never warranted
> except on a clear showing that there exists no genuine issue as to
> any material act and the moving party is entitled to judgment as a
> matter of law.  The moving party has the burden of establishing a lack
> of a triable factual issue, and all doubts as to the existence of such an

---

[16] This Court applies state law to the state tort.  **Van Zanen v. Qwest
Wireless LLC**, 522 F.3d 1127, 1130 (10th Cir. 2008).

issue must be resolved against the moving party.  A party against whom summary judgment is sought is entitled to the benefit of all favorable inferences that may be drawn from the facts.

*Churchey v. Adolph Coors Co*., 759 P.2d 1336, 339-40 (Colo. 1988)(citations omitted).  Thus, the burden was on Landsafe to show that there was no factual dispute and to show that the inferences that Ms. Wagner put in the record could not support her claim.  **See also**

*Continental Airlines, Inc. v. Keenan*, 731 P.2d 708, 713 (Colo. 1987), in which the Supreme Court held that summary judgment was improperly granted.

This is consistent with Tenth Circuit law, which notes that matters regarding the intent behind an employment decision are best left for a trial:

It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini trial" to determine the defendant's true state of mind.  So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial.  Judgments about intent are best left for trial and are within the province of the jury.

*Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).  *See also*

*Olson v. State Board for Community Colleges*, 759 P.2d 829, 831 (Colo. App. 1988)(issue of motivation behind a termination is a question of fact).

This Court in **Barlow**, 703 F.3d 497, considered an appeal almost identical to that herein.  The trial court had granted summary judgment to the employer on a claim of wrongful discharge against public policy upon grounds that the employee could not prove causation.  This Court reversed upon a finding that the employee had presented enough evidence upon which a jury could find causation.  **Id.**, at 509.

The issue in **Barlow** concerned whether the employer terminated the employee because the employee had exercised his right to claim worker's compensation for an injury.[17]  The employee had presented evidence that the site manager, a Mr. Smith, knew that people were becoming skeptical of the employee's claim for worker's compensation.  **Id.**, at 509.  The site manager also learned that the employee's attorney was becoming involved in the case and also questioned whether the employee might be changing his claim to seek something he was not entitled to.  Finally, there was evidence that an e-mail chain provided evidence of the employer's frustration that the employee might be collecting benefits to which he was

---

[17] The employee had also claimed he was terminated because of his race, but this Court found there was no factual support for that particular motivation.  However, this Court did find there was factual support that the motivation behind the termination may have been to retaliate against the employee for making a worker's compensation claim.  In other words, motivation is claim specific.

not entitled.  *Id.*  The inferences from this evidence established that there

was a factual dispute as to why the employee was terminated[18] and

required reversal of the summary judgment.  *Id.*

　　　Unlike in the *McDonnell Douglas* context, whether the employer's

reason for the termination was a pretext is not a separate issue.  In

*Barlow*, the employer claimed it had a valid reason for termination (poor

performance), but this was not a separate element of the summary-

judgment inquiry:

> Because England alleges it also had a legitimate reason for firing
> Barlow from a security guard position, we have a mixed-motive
> question of causation.  This remains as a question of material fact
> that survives summary judgment.  **See**, *e.g.*, *Webster v. Konczak
> Corp.*, 976 P.2d 317, 321 (Colo. App. 1998)(noting in a retaliatory
> discharge case that "[w]hile defendants presented evidence in conflict
> with the above version of events, as well as evidence that plaintiffs
> had been fired for poor job performance, this simply demonstrated
> that this was an issue of material fact that precluded entry of
> summary judgment").

*Barlow*, 703 F.3d at 509-10.

---

[18] **Compare** cases in the *McDonnell-Douglas* context where the courts
deemed evidence of causation could only be resolved by the factfinder—
**Bertsch**, 684 F.3d at 1029; *Lawley v. Department of Higher Education*,
36 P.3d 1239 (Colo. 2001); and *Bodaghi*, 995 P.2d at 308-09, where the
dissent pointed out that the five allegedly disputed facts were either not in
dispute or were not dispositive, which highlighted the fact that the Colorado
Supreme Court held that factual findings concerning intent were for the
factfinder and not to be resolved summarily.

In other words, according to ***Barlow***, the only inquiry in a tortious wrongful discharge case concerns the *prima facie* case outlined in ***Barlow***. To the degree that the employer claims it has a valid reason for the termination, that appears to be irrelevant to an employer's argument, unless it was the only reason given for causation.  If it is a disputed reason, the ultimate reason for the termination, between the two competing reasons, must be resolved by the jury.  In short, under ***Barlow***, the only inquiry is whether Ms. Wagner supported her *prima facie* case.

## XI.  CONCLUSION

Ms. Wagner respectfully requests that this Court reverse the decision of the district court regarding the state tort claim and remand for further proceedings, allowing the district court to determine if it has federal jurisdiction over the claim or if it should dismiss without prejudice allowing Ms. Wagner to refile in state court.

Oral argument is requested because some of the issues herein are matters of first impression to this Court.

## XII.  CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed.R.App.P.

32(a)(7)(B) because this brief contains 10,515 words, inclusive of

everything including footnotes.

## XIII.  CERTIFICATE OF COMPLIANCE WITH RULE 25.3

Counsel hereby certifies that:

1.    All required privacy redactions have been made;
2.    The hard copies of the pleadings submitted to the clerk's office are exact copies of the ECF filing; and
3.    The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, *ESET NOD32 Antivirus* Version No. 4, updated October 31, 2013, and, according to the program, is free of viruses.

A copy of the order being appealed is attached.

Respectfully submitted this October 31, 2013.

By:   s/   *Robert M. Liechty*
          Robert M. Liechty
          CROSS LIECHTY LANE PC
          7100 East Belleview Ave., Suite G-11
          Greenwood Village, Colorado 80111
          Tel:  (303) 333-4122
          Email:  rliechty@crossliechty.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this October 31, 2013, a true and correct copy of the above and foregoing **OPENING BRIEF** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Elena D. Marcuss
7 Saint Paul Street
Baltimore, Maryland 21202
emarcuss@mcguirewoods.com

Donald L. Samuels
Desmonne Bennett
Bryan Cave HRO
1700 Lincoln St., Suite 4100
Denver, Colorado 80203-4541
donald.samuels@bryancave.com
desmonne.bennett@bryancave.com

<u>s/    *Linda L. DeVico*   </u>